René P. Tatro (SBN 078383)
Steven R. Tekosky (SBN 102918)
Juliet A. Markowitz (SBN 164038)
TATRO TEKOSKY SADWICK LLP
333 S. Grand Avenue, Suite 4270
Los Angeles, CA  90071
Telephone:    (213) 225-7171
Facsimile:    (213) 225-7151
E-mail:       rtatro@ttsmlaw.com
              stekosky@ttsmlaw.com
              jmarkowitz@ttsmlaw.com

Attorneys for Plaintiff Pharmavite LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHARMAVITE LLC, a California limited liability company, | Case No. 2:20-cv-8001 |
| Plaintiff, | **PHARMAVITE LLC'S FIRST AMENDED COMPLAINT FOR:** |
| v. | **(1) CIVIL RICO, 18 U.S.C. SECTIONS 1962 & 1964;** |
| CLEAN LABEL PROJECT FOUNDATION, a Delaware corporation; PURE MARKET, LLC, a Colorado limited liability company; THIRD PARTY VALIDATION & VERIFICATION LLC dba ELLIPSE ANALYTICS, a Colorado limited liability company; and Kevin Hicks, an individual, | **(2) VIOLATION OF THE LANHAM ACT, 15 U.S.C.§ 1125(a);** |
| Defendants. | **(3) UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§17200 *et seq.*; and** |
| | **(4) DECLARATORY RELIEF, 28 U.S.C. § 2201 *et seq.*** |
| | **JURY TRIAL DEMANDED** |

Plaintiff Pharmavite LLC ("Pharmavite") hereby alleges as follows against defendants Clean Label Project Foundation, Pure Market, LLC, Third Party Validation & Verification LLC dba Ellipse Analytics, and Kevin Hicks (collectively, "Defendants"):

## NATURE OF ACTION

1.       Defendants have combined and acted in concert in a money-making "protection racket" that Michael Avenatti likely would have envied:  Step 1. Use the cover of a not-for-profit entity to contrive a subjective and opaque purity "grading" system for dietary supplements that eschews the standards set by federal and state regulators but nonetheless purports to protect consumers; Step 2. Have that entity become a "retail partner" with another entity that is owned and controlled by a purportedly "independent" laboratory which conducts unspecified tests against unspecified standards; Step 3. Using the results of that "independent laboratory," award a "purity certificate" to those entities who pay the demanded fee, but have the "retail partner" publish a false "bad grade" for those whose products are no less pure, *and then demand millions of dollars in exchange for not filing a sham lawsuit claiming the products are "adulterated," not "clean," or "impure."* To date, the lead named Defendant has filed no fewer than 15 such lawsuits, and presumably has threatened numerous others, including threatening to file and thereafter filing a sham lawsuit against Plaintiff Pharmavite, unless Pharmavite pays millions of dollars for the lead named Defendant to stand down. Defendants' scheme and sham lawsuits are not in the interest of consumers or in furtherance of the truth regarding the products that Defendants reward or punish with their fictitious testing and grading system. But it is so well concealed behind a smokescreen of entities and fine print on Defendants' websites that it would be all but impossible for a consumer to ferret out the truth. This complaint, asserting claims under the U.S. Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Lanham Act, and California's Unfair Competition Law ("UCL"), among other claims, is the first step in pulling back the curtain on the deceptive and illegal extortion scheme that Defendants are perpetrating. The general structure of the scheme appears to be the

PHARMAVITE LLC'S FIRST AMENDED COMPLAINT

brainchild of Defendant Kevin Hicks, who, as discussed below, is Chief Executive Officer ("CEO") of and controls two of the Defendants, and identifies himself as the "Chief Client Advocate" for the third Defendant. Defendant Hicks has used similar, if not identical, multi-layered testing/grading/retailing schemes (some involving one or more of the Defendants) previously in a variety of industries, including the wine and beverage industry. Defendant Hicks administers his schemes from, among other places, his $2.5 million, 8,000 square foot mansion in Golden, Colorado.

## JURISDICTION AND VENUE

2.　This Court has jurisdiction over this matter pursuant to 28 U.S.C. Sections 1331, 1367, 2201, and 2202; 18 U.S.C. Section 1964; and the doctrine of pendent jurisdiction. The amount in controversy exceeds $75,000, exclusive of interest and costs.

3.　Pharmavite's claims arose in this district, and Pharmavite or its agents may be found or transact affairs in this district. In addition, upon information and belief, Defendants have conducted business in this district by marketing, selling, and conveying "awards," "certifications," and favorable "grades" to entities doing business in this district, by sending threats of sham litigation to Pharmavite in this district for refusing to pay Defendants or participate in Defendants' evaluation charade as part of Defendants' fraudulent and extortionist shake down scheme, and by disparaging Pharmavite's products nationally via the Internet, thereby causing harm to Pharmavite in this district. Venue in this district is therefore appropriate under 15 U.S.C. Section 22, 28 U.S.C. Section 1391, and 18 U.S.C. Section 1965(a).

## THE PARTIES

4.　Plaintiff Pharmavite LLC is a California limited liability company with its principal place of business in West Hills, California.

5.　Pharmavite manufactures, largely in California, Nature Made® brand vitamins and supplements. Among its products are two prenatal supplements, Nature Made® Prenatal Multi tablets and Nature Made® Prenatal Multi + DHA softgels, both

of which come in several different sizes (collectively, the "Nature Made® Prenatal Supplements").

6.      Annually and over past decades, Pharmavite's investments of money and resources to ensure its products' quality and consistency is, and has been, substantial. Pharmavite cares about its consumers and strives to assure that consumers receive products that meet or exceed applicable regulatory standards. In that regard, Pharmavite voluntarily goes beyond applicable governmental standards governing dietary supplement safety, like those of the U.S. Food and Drug Administration ("FDA") and California Health and Safety Code Section 25249.5 *et seq.* ("Proposition 65"), and meets the even stricter standards and rigorous review of the United States Pharmacopeial Convention, Inc. ("USP"). Pharmavite has strong product ingredient and manufacturing protocols, and equally robust quality control procedures, which are carefully followed. Pharmavite does not put products into the marketplace unless they meet applicable governmental specifications as well as Pharmavite's own rigorous specifications—including those for quality and potency as of the products' respective expiration dates. Pharmavite's specifications on its Nature Made® Prenatal Supplements comply with Proposition 65, FDA, and the USP. Pharmavite hires and uses well-qualified manufacturing and analytical personnel. Pharmavite has strong and protective product-ingredient standards and specifications. Pharmavite has proper finished-product specifications for all its products, including the Nature Made® Prenatal Supplements, and Pharmavite's Certificates of Analysis for those Supplements confirm that their finished-product testing met all specifications.

7.      Defendant Clean Label Project Foundation ("CLP") is a Delaware nonprofit corporation with its principal place of business at 280 E. 1st Ave., Broomfield, Colorado.

8.      CLP claims that its mission is "to bring truth and transparency to food and consumer product labeling" by testing and "certifying" consumer products, using standards that are the antithesis of "transparent." CLP also states that it "encourage[s]

brands to join [it] in becoming part of the solution to address the growing consumer concern of industrial & environmental contaminants and toxins in both food and consumer products"—by which, Pharmavite is informed and believes, and thereon alleges, that CLP means that it encourages brands (or their manufacturers) to pay CLP to "certify" their products. CLP advertises the so-called "certified" products on its website (https://cleanlabelproject.org) as purportedly being the "best" in certain categories, including prenatal vitamins, baby food, and protein powder.

9.    Defendant Pure Market, LLC ("Pure Market") is a Colorado limited liability company with its principal place of business at 7000 Broadway, Suite 307, Denver, Colorado. Defendant Hicks is the CEO of and controls Pure Market. CLP identifies Pure Market as its "advocacy retail partner." Pure Market has positioned itself to "become the leader in selling direct to consumers" and selling direct to consumers on its website, mobile app and browser extensions, or on an "ecommerce platform giving consumers the choice to buy products directly...."

10.    Pure Market purports to "grade" consumer products (including the Nature Made® Prenatal Supplements) and publish those letter grades on its website (https://www.puremarket.com), and CLP directs consumers to the puremarket.com website to "view the worst" products in a given category. *See, e.g., https://cleanlabelproject.org/the-best-worst-prenatal-vitamin-products/*. Pure Market uses undefined descriptors including "poor," "fair," "good," and "excellent," and similarly undefined color-coded bars, to rate products' alleged "nutrition" and "purity," including heavy metals and pesticides. Pure Market also compares the consumer products it "grades" with other purportedly similar products. CLP's claims of "transparency" notwithstanding, CLP and Pure Market have been criticized for refusing to disclose the methodology used (if any *is* used, other than a subjective or result-oriented one) to "grade" products and assign them a rating. *E.g.,* http://www.chadhayesmd.com/the-clean-label-project-is-playing-dirty/;
https://www.reddit.com/r/dogs/comments/6l0vs4/discussion_recent_claims_by_clea

n_label_project/. Through its concerted efforts with the other Defendants, Pure Market drives away or diverts customers who would otherwise purchase Pharmavite products, and drives or diverts those customers to sellers who compete with Pharmavite and who "sponsor" Defendants, pay Defendants for "certifications" and "good" or "excellent" grades, or who otherwise participate with Defendants in the grading program, but whose products are not superior to Pharmavite's. Through this scheme, Defendants are at least indirect competitors of Pharmavite, and are directly benefiting Pharmavite's competitors. Defendants knew or were recklessly indifferent to the fact that Pharmavite is within the zone of interest whose sales, capital, corporate resources, and reputation are directly and proximately impacted by Defendants' provision of disparaging and misleading information to consumers about Pharmavite's products (especially as compared to other products with which Pharmavite competes and to which customers are "steered" via "certifications" paid to Defendant CLP as part of Defendants' scheme).

11.     Defendant Third Party Validation & Verification LLC dba Ellipse Analytics ("Ellipse Analytics") is a Colorado limited liability company with the same principal place of business as Pure Market, *i.e.*, 7000 Broadway, Suite 307, Denver Colorado. Ellipse Analytics purportedly performs the testing on which CLP and Pure Market rely in "grading" and ranking the various consumer products as "best" and "worst." These products include Pharmavite's Nature Made® Prenatal Supplements.

12.     Pure Market is owned by Ellipse Analytics. Both defendants share a single CEO, Defendant Hicks. Pure Market and Ellipse Analytics have additional overlapping management and employees.

13.     Defendant Kevin Hicks is a resident of Colorado. As noted above, Defendant Hicks is the CEO of, and controls, defendants Pure Market and Ellipse Analytics. Defendant Hicks also identifies himself as CLP's "Chief Client Advocate." In that capacity, Defendant Hicks used interstate wires to contact and threaten Pharmavite with sham litigation. More specifically, Defendant Hicks used interstate wires and

contacted Pharmavite on behalf of CLP, identifying himself as CLP's "Chief Client Advocate." In his contact with Pharmavite on behalf of CLP, Defendant Hicks threatened to direct CLP to sue Pharmavite on claims Pharmavite knows to be objectively baseless and without legal merit and for which Hicks claimed Pharmavite, if it were successful in defending CLP's lawsuit, would pay more in litigation fees and costs than the $1.9 million CLP demanded from Pharmavite in its fraudulent shakedown scheme. Defendant Hicks' roles as CEO of Pure Market and Ellipse Analytics, as well as CLP's "Chief Client Advocate," is just one example of the overlapping roles Defendants have performed in their scheme. Another example, in addition to those above, is that CLP's Executive Director, Jackie Bowen, formerly was the President of Ellipse Analytics, and served both entities at the same time for several months. Defendant Hicks has a past and current web of entities and business interests involved in multiple consumer products which employ schemes, devices, and artifices substantially similar to the one alleged herein to drive or divert consumers through devious means and obfuscation into transactions that directly or indirectly benefit Defendant Hicks and/or his entities and the other Defendants herein.

14.      For the reasons set forth above, among others, Pharmavite is informed and believes and thereon alleges that Defendants CLP, Pure Market, Ellipse Analytics, and Hicks constitute a single enterprise (sometimes referred to herein as the "Product Testing, Grading, and Sham Lawsuit Enterprise") and have acted in conformity with a single enterprise or association-in-fact enterprise with respect to the acts and violations of law alleged herein.

15.      At all times relevant to this Complaint, Defendants CLP, Pure Market, Ellipse Analytics, and Hicks acted in concert and as agents of each other to aid, effectuate and in furtherance of the illegal schemes set out herein.

## GENERAL ALLEGATIONS

16.      On or before July 14, 2020, and continuing to this day, Defendants used the mail and interstate wires, including their publicly accessible Internet websites which

PHARMAVITE LLC'S FIRST AMENDED COMPLAINT

are marketed and promoted to consumers nationwide, in their employment of devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of conduct to cause monetary harm to Pharmavite, to fraudulently disparage the reputation of Pharmavite and its Nature Made® brand, to extort money from Pharmavite, and to fraudulently, misleadingly, and with reckless indifference drive or divert consumers away from Pharmavite to products, the sale of which will directly or indirectly benefit Defendants, as well as Pharmavite's direct competitors. The actions of Defendants include the fraudulent making, posting, and linking to disparaging quality grades and rankings for certain of Pharmavite's Nature Made® Prenatal Supplements in comparison to competing products (some of which are dissimilar in formulation). These fraudulent and disparaging grades and rankings are intended to directly or indirectly benefit Defendants, or those competitors of Pharmavite who pay to "sponsor" or get "certified" by Defendants. Defendants accomplish that by, among other things, leveraging the threat or fact of "bad" grades or rankings and/or the threat of sham litigation to compel companies such as Pharmavite to pay millions of dollars to settle the sham lawsuits, pay Defendants for "certifications," and/or pay to participate in and thereby receive "good" or "excellent" grades and rankings from Defendants—even though the products receiving such good/excellent grades and rankings are no better than, and no more compliant with, FDA safety standards than Pharmavite's products. Defendants' game plan, as stated in an Ellipse Analytics "Dashboard," is to eventually sell products direct to consumers, including with its own brands, which compete with those that it intentionally or with reckless indifference disparages with low-quality grades and rankings. The actions of Defendants include the making of untrue statements of material facts; omitting material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaging in practices and courses of business which demonstrate a reckless indifference to truth and which operate as a fraud and deceit upon Pharmavite. Defendants' continuing fraudulent acts have resulted, and continue to result, in

PHARMAVITE LLC'S FIRST AMENDED COMPLAINT

monetary damage, injury, and detriment to Pharmavite, as well as damage, detriment and injury to its reputation.

17.    Although well concealed, Defendants' fraudulent extortion scheme is remarkably simple and remarkably nefarious. For a price, CLP offers to provide companies a "Certification" or "Award" for their products, including prenatal vitamins, baby food, and other types of products. CLP has a "Code of Practice: Certification" (the "CLP Certification Code of Practice") which instructed (as of August 29, 2020) that "[a]ll products seeking Clean Label Project Code of Practice certification shall pass a test to ensure compliance to the Clean Label Project tolerances established in" Section VII the CLP Certification Code of Practice ("Section VII"). As discussed below, CLP, acting in concert with, and as part of, Defendants' enterprise, has a "carrot and stick" strategy, which is designed to make every company in a given consumer product space targeted by CLP (and/or by the other Defendants as part of their enterprise) pay, one way or the other: either a company pays CLP to get "certified," which the company then advertises as a competitive advantage over uncertified competitors, or the company gets sued by CLP on phony claims. To prime the pump, and as part of Defendants' enterprise, CLP and/or Ellipse Analytics either gave away or discounted certifications to early adopting companies ("early adopters") in order to exacerbate the competitive disadvantage to those companies who chose not to pay for Defendants' phony certifications.

18.    For dietary supplements like Pharmavite's Nature Made® Prenatal Supplements, Section VII sets the following not-to-be-exceeded maximum tolerance standards, among others, to obtain "Certification" from CLP:

- Cadmium: 4.1 micrograms/daily serving (by ingestion);
- Lead: 0.5 micrograms/daily serving; and
- Total Pesticides: "Code of Federal Registrar Pesticide Chemical Tolerance Levels for Food."

19.    CLP claims that the lead and cadmium standards in Section VII are based on the regulatory safe harbor standards set pursuant to Proposition 65.

20.    Pharmavite is informed and believes, and thereon alleges, that if a product meets the standards set out in CLP's Section VII, and if the manufacturer pays CLP for the Certification, CLP will grant the product its "Clean Label Project Certification."

21.    Pharmavite's Nature Made® Prenatal Supplements meet applicable federal and state quality requirements and standards, and (as explained below) meet CLP's Section VII's maximum tolerance limit requirements.

22.    Commencing on a date presently unknown to Pharmavite, but no later than July 14, 2020, and continuing to this day, CLP, acting directly, and by and through and in concert with Defendants Ellipse Analytics, Pure Market, and Hicks, in furtherance of Defendants' enterprise, and using interstate wires, posted on CLP's website via a link to Pure Market's website—based on alleged testing by Ellipse Analytics and, on information and belief, at the direction of Defendant Hicks— fraudulent and disparaging "quality grades" of C+ and D+ for two of the Nature Made® Prenatal Supplements in contravention of CLP's own Section VII's maximum tolerance limit requirements.

23.    Specifically, Defendants posted and continue to post on Pure Market's website—to which CLP's website links—that the 90-count version of Nature Made® Prenatal Multi rates a grade of D+, although the 250-count version of the same product inexplicably was awarded a grade of C+. Pure Market lists the "purity" of both the 90-count and 250-count versions of the Nature Made® Prenatal Multi as "fair" (without explaining what that means), and lists the "heavy metals" in the 90-count version as "below average" and in the 250-count version as "fair" (again without explaining what either means). The categories are depicted on Pure Market's website as lines of varying colors; on the 90-count version, the "heavy metals" category is red, while the overall "purity" is orange.

24.     These published "Grades" for Plaintiff's Nature Made® Prenatal Supplements are unsupported by Defendants' own published standards. They are bogus, unwarranted, and in contravention of CLP's own Section VII's maximum tolerance limit requirements. In this manner, Defendants, acting in concert, are disparaging Pharmavite and causing it reputational and monetary harm, while simultaneously driving or diverting business to products which are no better than Pharmavite's, but which are sold by companies, including the early adopters, that have paid to get "certified" by CLP and Ellipse Analytics pursuant to Defendants' scheme.

25.     Defendants' next step in their racketeering scheme was to use the mail and interstate wires to have CLP threaten to sue Pharmavite in a sham lawsuit, claiming without basis that Pharmavite's Nature Made® Prenatal Supplements (the two that were given "grades" of C+ and D+, as well as two that were given "grades" of B+) are adulterated, unless Pharmavite paid CLP millions of dollars. Defendants in fact filed that sham litigation, which litigation is inextricably linked to Defendants' overarching scheme of monetizing CLP's phony certifications or, as stated in Ellipse Analytics' "Dashboard," in what Defendants call their "Legal Play," CLP's sham lawsuits. Defendants knew, or through their reckless indifference to the truth should have known, that Pharmavite's Nature Made® Prenatal Supplements are not adulterated in any manner whatsoever, and are no more "adulterated" or less "adulterated" than competitive and other products CLP certifies on behalf of manufacturers that apparently have signed up and paid for certification.

26.     Pharmavite is informed and believes and thereon alleges that this unlawful and fraudulent money-making scheme is the crux and common purpose of Defendants' enterprise, through which Defendants have swindled numerous companies to either pay CLP—either for a fraudulent "Certification," "Purity Award," or good "grades"—or be targeted and threatened with or named in sham lawsuits for selling products that are every bit as safe and regulation-compliant as those products sold by the companies that give in to CLP's extortion tactics. Pharmavite is informed and believes, and thereon

alleges, that it is simply one of Defendants' most recent targets for perpetrating this scam.

27.    Specifically, at the end of the first week in August 2020, Pharmavite received a demand letter dated July 14, 2020 (the "July 14, 2020 Demand Letter") with an enclosed draft complaint sent via U.S. Mail on behalf of CLP by a Michigan law firm. The draft complaint falsely alleged that Pharmavite violated the District of Columbia Consumer Protection Procedures Act, D.C. Code Sections 28-3901 *et seq.*

28.    CLP's July 14, 2020 Demand Letter and enclosed draft complaint erroneously asserted that the Nature Made® Prenatal Supplements are adulterated with two heavy metals, lead and cadmium; are adulterated with pesticides; and are under-formulated with respect to folic acid. In fact, Nature Made® Prenatal Supplements are compliant with applicable governmental standards, including Proposition 65 and FDA standards, adhere to the USP, and are not adulterated with the heavy metals lead and cadmium; are not adulterated with pesticides; and are not under-formulated with respect to folic acid.

29.    CLP's assertions as set forth in its July 14, 2020 Demand Letter and enclosed draft complaint are premised, in part, on putative marketing claims that Pharmavite does not make regarding the products addressed in the letter, and on the putative conduct of a wholly-distinct dietary supplement company with which Pharmavite competes, but with which it does not have any other relationship. CLP threatened to file the sham lawsuit against Pharmavite in the Superior Court of the District of Columbia if Pharmavite did not agree to pay to CLP the sum of $1.9 million and acquiesce to other demands from CLP premised on its erroneous assertions about the Nature Made® Prenatal Supplements.

30.    On August 18, 2020, CLP sent by interstate wires a second letter and email message to Pharmavite, again via its Michigan counsel, in furtherance of its sham litigation threat. Therein, CLP refused to provide testing information about the Nature Made® Prenatal Supplements requested by Pharmavite, and instead refocused on

extorting money from Pharmavite to resolve the sham litigation, writing that if Pharmavite did not "resolve" the matter with CLP, CLP "will move forward with filing the complaint."

31.    In furtherance of the scheme to defraud Pharmavite, on August 28, 2020, Defendant Hicks (the CEO of both Ellipse Analytics and Pure Market) emailed Pharmavite on behalf of CLP, identifying himself as CLP's "Chief Client Advocate" and referring to CLP as "our client." In his email, Hicks threatened to direct CLP to sue Pharmavite on claims Pharmavite knows to be without any legal merit, writing that "[w]e are proceeding with filing a complaint against Pharmavite," and threatening that "[i]f you lose, Pharmavite can expect to pay tens of millions if not more in damages."

32.    Pharmavite refused to pay the money demanded by CLP and Hicks. Accordingly, on September 4, 2020, CLP filed sham litigation against Pharmavite in the Superior Court for the District of Columbia, challenging not only the two Nature Made® Prenatal Supplements that were given "grades" of C+ and D+, but also the two that were given "grades" of B+.

33.    The "independent" testing on which CLP and Pure Market rely was performed, in part, by Ellipse Analytics—which is anything but "independent," and is one of the interconnected Defendants that comprise the enterprise alleged herein.

34.    On their websites, CLP and Pure Market describe their testing methodologies, presumably including those on which their "grades" and threatened and asserted claims against Pharmavite are based, in identical terms. CLP and Pure Market refuse to guarantee the accuracy of the information or their analysis thereon:

> As we are testing one sample of each product, the presence and composition of various elements may vary from package to package. There may very well be inherent variability of the elements by lot and by individual unit. The findings that appear on our website, reflect our research at the time of publication, and may not be representative of other runs, lots, and even within an individual unit (e.g. bag, canisters, etc.) of the particular product tested. We cannot guarantee the accuracy of the information or analysis based thereupon. *See*

https://cleanlabelproject.org/terms-and-conditions/at ¶ 19;
https://www.puremarket.com/terms-conditions/ (Lab Testing
Methodology).

35.    Both CLP and Pure Market further attempt to disclaim responsibility for

the results and analyses, as follows:

> The results and findings are based on our own opinion and
> interpretation. The lab we use employs industry standard equipment and
> keeps it well maintained, but variances in instrumentation can cause
> variability or inaccuracies in the data and results. The lab data and results
> produce margins of error. Moreover, if there is any degradation, or if
> there are subsequent product reformulations or other factors, this
> information might no longer be current. Our database is dynamic, which
> means that the findings may change based on evolving science, new
> information, new product tests, or other factors. We make no
> representations or warranties about any of the findings on our site. *See*
> https://cleanlabelproject.org/terms-and-conditions/at ¶ 19;
> https://www.puremarket.com/terms-conditions/ (Lab Testing
> Methodology).

36.    Even accepting Defendants' results as accurate, CLP's claims about lead in

Pharmavite's Nature Made® Prenatal Supplements are false, and the grades published

on Pure Market's website and linked to by CLP's website for the Nature Made®

Prenatal Supplements are unwarranted and intentionally designed to disparage

Pharmavite and cause it reputational and monetary harm unless and until Pharmavite

agrees to pay.

37.    That is, the amount of lead that CLP (or Ellipse Analytics) claims to have

detected in Pharmavite's Nature Made® Prenatal Supplements is ***lower*** than

Proposition 65's safe harbor allowance of 0.5 micrograms/day for lead. The amount of

lead allegedly detected thus also is ***lower*** than CLP's own standards set forth in Section

VII, which provide that the maximum allowance for lead is 0.5 micrograms/daily

serving.

38.    CLP's claims about cadmium in Pharmavite's Nature Made® Prenatal

Supplements, and the grades published on Pure Market's website and linked to by

CLP's website for the Nature Made® Prenatal Supplements, are similarly false and unwarranted, and likewise intentionally designed to disparage Pharmavite and cause it reputational and monetary harm unless and until Pharmavite agrees to pay.

39.     That is, the amount of cadmium that CLP (or Ellipse Analytics) allegedly detected in Pharmavite's Nature Made® Prenatal Supplements is **lower** than Proposition 65's safe harbor allowance of 4.1 micrograms/day for cadmium. It likewise is **lower** than the maximum allowance for cadmium under CLP's own standards as set forth in Section VII.

40.     CLP's claims about pesticides in Pharmavite's Nature Made® Prenatal Supplements, and the grades published on Pure Market's website and linked to by CLP's website for the Nature Made® Prenatal Supplements, are similarly erroneous and unwarranted and likewise intentionally designed to disparage Pharmavite and cause it reputational and monetary harm unless and until Pharmavite agrees to pay.

41.     That is, the amount of trace pesticides that CLP (or Ellipse Analytics) allegedly detected in Pharmavite's Nature Made® Prenatal Supplements is **lower** than any stated in the Code of Federal Regulations Tolerances and Exemptions for Pesticide Chemical Residues in Food. Accordingly, it also is lower than the maximum allowance for pesticides under CLP's Section VII maximum tolerance standards.

42.     CLP's claims about folic acid, and the grades published on Pure Market's website and linked to by CLP's website, are similarly erroneous and unwarranted and likewise intentionally designed to disparage Pharmavite and cause it reputational and monetary harm unless and until Pharmavite agrees to pay. In fact, Pharmavite's Nature Made® Prenatal Supplements are formulated and rigorously tested to ensure that 100% or more of the label claim's folic acid is present in each product as of their respective expiration dates.

43.     The fraudulent nature of Defendants' sham litigation (as well as their Certification program) and "grades" is further revealed by the fact that CLP and Pure Market list as "the Best" prenatal vitamins those of one of Pharmavite's direct

competitors, a company called SmartyPants Vitamins ("SmartyPants")—even though the levels of lead in certain lots of SmartyPants' prenatal supplements, and the levels of cadmium in certain lots of SmartyPants' vitamins, are **equal to or higher than** those in the lots of Nature Made® Prenatal Supplements allegedly tested by Defendants.

44.    The CLP website reveals that CLP has awarded SmartyPants prenatal vitamins a CLP Purity Award. According to CLP's Code of Practice, the Purity Award is a "benchmarked" award allegedly given to products that meet the Code of Practice Certification standards and that are in the top 33% of those products tested in the category at issue.

45.    Yet SmartyPants' products do not appear to meet CLP's standards for issuance of the CLP Purity Award. The "Certification of Compliance" published on SmartyPants' website shows various CLP certifications-bearing prenatal products with significantly **higher** daily lead levels (expressed as micrograms/lead/daily serving) than the lead levels for which CLP threatened to sue, and sued, Pharmavite and for which Pure Market gave the Nature Made® Prenatal Supplements poor "grades."

46.    Likewise, SmartyPants' website show various CLP certifications-bearing and "Purity Award"-bearing products with **equal** or **higher** levels of cadmium (expressed as micrograms/cadmium/daily serving) than the cadmium levels Defendants claim to have detected in Pharmavite's Nature Made® Prenatal Supplements, for which CLP threatened to sue, and sued, Pharmavite, and for which Pure Market gave the Nature Made® Prenatal Supplements poor "grades."

47.    Defendants' ratings system for broad categories of dissimilar prenatal dietary supplements is fraudulent, and all times material herein Defendants knew or recklessly disregarded that their "benchmarking" on products in a broad category, without taking into account the significant differences in product formulation and ingredients, can impact the amounts of trace metals and pesticides detected and, accordingly, impact test results. As just one example, products containing more calcium likely will test higher for lead than products that do not contain calcium, as there are

always trace amounts of lead in calcium. Accordingly, it would be scientifically and logically inappropriate to compare trace lead levels in a prenatal supplement containing calcium with lead levels in a prenatal supplement without calcium. Yet this is what Defendants do with respect to their lumping and rating all prenatal supplements together, regardless of their ingredients or formulations. In short, Defendants' "benchmarking" of products is recklessly indifferent to the facts and circumstances that would approximate an "apples to apples" comparison, or benchmarking, of products.

48.    Defendants' actions, including their reckless indifference to the truth regarding the nature and differences in ingredients and formulations for products that they lump together for grading, and their reckless indifference to the truth regarding the levels, nature, and legal effect of chemicals they claim were detected in Pharmavite's Nature Made® Prenatal Supplements, are part of a scheme or artifice to defraud, and are calculated to disparage and Pharmavite's Nature Made® Prenatal Supplements, and to extort money from Pharmavite in order to avoid the sham litigation CLP threatened to file, and has now filed, based on Defendants' baseless and unscientific testing results.

49.    Defendants' continuing illegal and fraudulent acts have resulted, and continue to result, in damage, injury, and detriment to Pharmavite, including the following:  lost sales; loss of scores of hours of employee and executive time in investigating, analyzing, and responding to Defendants' threats and sham claims (pulling those employees away from their regular assigned job functions); attorney fees, consulting fees, and expert and other professional fees to investigate, analyze, respond to, and defend against, Defendants' threats and sham claims; and reputational injury. Among other things, through their continuing illegal and fraudulent acts, and as is their stated intent, Defendants—who are at least indirect competitors of Pharmavite and are directly benefiting Pharmavite's competitors—have driven away or diverted customers who would otherwise purchase Pharmavite products, and have driven or diverted those customers to sellers who compete with Pharmavite (including SmartyPants) and who pay Defendants for (or otherwise receive from Defendants as "early adopters" or

grading program participants) the phony "certifications" and "good" or "excellent" grades, but whose products are not superior to Pharmavite's. Defendants' scheme has caused Pharmavite monetary harm in the loss of sales of its Nature Made® Prenatal Supplements by potential customers who viewed the bad "grades" and decided not to purchase Nature Made® Prenatal Supplements as a result, including some such potential customers who instead decided to purchase SmartyPants prenatal supplements touted by Defendants. Defendants knew or were recklessly indifferent to the fact that Pharmavite is within the zone of interest whose sales and reputation are adversely impacted by Defendants' provision of disparaging and misleading information to consumers about Pharmavite's products (especially as compared to other products with paid "certifications" with which products Pharmavite's compete and to whose products Defendants schemed to steer customers).

### FIRST CLAIM FOR RELIEF

(Civil RICO, 18 U.S.C. §§ 1962, 1964)

50.    Pharmavite incorporates paragraphs 1 through 49 as though fully set forth herein.

51.    Defendants violated RICO by violating 18 U.S.C. § 1962, entitling Pharmavite to the remedies specified in 18 U.S.C. § 1964.

52.    At all material times, Defendants engaged in an enterprise, the activities of which affected interstate commerce.

53.    Defendants and the Product Testing, Grading, and Sham Lawsuit Enterprise conducted the affairs of their association-in-fact enterprise through a pattern of racketeering activity, with each of Defendants playing a different role in order to make it appear that each of Defendants was acting independently and objectively, *i.e.,* separately from one another, when in fact Defendants were acting by and through their common enterprise. In so doing, Defendants engaged in the fraudulent schemes, acts, and misrepresentations described above, which violate 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 875 (extortion), 18 U.S.C. § 1951 (extortion),

Cal. Penal Code § 523(a) (extortion), and a pattern of racketeering. Defendants' acts all occurred within ten years of one another.

54.    Each of Defendants' racketeering activities, taken by and through Defendants' association-in-fact enterprise, was undertaken for the specific purpose of furthering the common purpose and scheme of the enterprise to defraud or extort money from Pharmavite (and others) as described herein, and to obtain gain and profit at the expense of Pharmavite. Defendants' racketeering activities involved the same or similarly situated participants and had, or were designed to have, similar results or impacts on Pharmavite. Pharmavite is informed and believes and thereon alleges that Defendants' activities were done as a regular way of conducting Defendants' schemes or businesses. These acts constitute a pattern of racketeering activity within the meaning of RICO.

55.    Defendants, by and through their association-in-fact enterprise, received income and other monetary benefits derived from a pattern of racketeering activity. Defendants used the income and other monetary benefits derived from a pattern of racketeering activity in the operation of the enterprise engaged in interstate commerce whose activities affected interstate commerce. Such use of racketeering proceeds stripped Defendants of any incentive to abide by their obligations under law, thereby causing damage to Pharmavite's business and property.

56.    Commencing on a date currently unknown to Pharmavite, but not earlier than January 1, 2018, Ellipse Analytics, acting in furtherance of Defendants' association-in-fact enterprise, conducted analytical testing of the 90-count version of Pharmavite's Nature Made® Prenatal Multi Supplements. Ellipse Analytics conducted such testing for the specific purpose of furthering the common purpose and scheme of the enterprise to extort or defraud Pharmavite as described herein, and to wrongfully obtain gain and profit at the expense of Pharmavite by, among other things, extorting money through threats of an objectively baseless lawsuit and/or disadvantaging Pharmavite competitively and reputationally, to the benefit of those companies which participate or

cooperate—willingly or unwillingly—in Defendants' scheme, and causing Pharmavite to sustain other losses and suffer other injuries.

57.     Commencing on a date currently unknown to Pharmavite, but not earlier than January 1, 2018, Ellipse Analytics, acting in furtherance of Defendants' association-in-fact enterprise, conducted analytical testing of the 250-count version of Pharmavite's Nature Made® Prenatal Multi Supplements. Ellipse Analytics conducted such testing for the specific purpose of furthering the common purpose and scheme of the enterprise to extort or defraud Pharmavite as described herein, and to obtain gain and profit at the expense of Pharmavite by, among other things, extorting money through threats of an objectively baseless lawsuit and/or disadvantaging Pharmavite competitively and reputationally, to the benefit of those companies which participate or cooperate—willingly or unwillingly—in Defendants' scheme, and causing Pharmavite to sustain other losses and suffer other injuries..

58.     Pharmavite is informed and believes and thereon alleges that commencing on a date currently unknown to Pharmavite, but not earlier than January 1, 2018, Ellipse Analytics, acting in furtherance of Defendants' association-in-fact enterprise, used interstate wires to transmit to one or more of the other Defendants the results and data related to its analytical testing of the 90-count version of Pharmavite's Nature Made® Prenatal Multi Supplements. Ellipse Analytics transmitted the results and data related to such analytical testing for the specific purpose of furthering the common purpose and scheme of the enterprise to extort or defraud Pharmavite as described herein, and to wrongfully obtain gain and profit at the expense of Pharmavite by, among other things, extorting money through threats of an objectively baseless lawsuit and/or disadvantaging Pharmavite competitively and reputationally, to the benefit of those companies which participate or cooperate—willingly or unwillingly—in Defendants' scheme, and causing Pharmavite to sustain other losses and suffer other injuries, including but not limited to the cost of investigating and defending against Defendants' objectively baseless claims.

59.     Pharmavite is informed and believes and thereon alleges that commencing on a date currently unknown to Pharmavite, but not earlier than January 1, 2018, Ellipse Analytics, acting in furtherance of Defendants' association-in-fact enterprise, used interstate wires to transmit to one or more of the other Defendants the results and data related to its analytical testing of the 250-count version of Pharmavite's Nature Made® Prenatal Multi Supplements. Ellipse Analytics transmitted the results and data related to such analytical testing for the specific purpose of furthering the common purpose and scheme of the enterprise to extort or defraud Pharmavite as described herein, and to wrongfully obtain gain and profit at the expense of Pharmavite by, among other things, extorting money through threats and/or disadvantaging Pharmavite competitively and reputationally, to the benefit of those companies which participate or cooperate—willingly or unwillingly—in Defendants' scheme, and causing Pharmavite to sustain other losses and suffer other injuries, including but not limited to the cost of investigating and defending against Defendants' objectively baseless claims.

60.     Commencing on a date currently unknown to Pharmavite, but not earlier than January 1, 2018, Pure Market, acting in furtherance of Defendants' association-in-fact enterprise, posted on its website—to which CLP's website links—that, based upon the "independent" testing of Ellipse Analytics, the 90-count version of Pharmavite's Nature Made® Prenatal Multi rates a grade of D+. Pure Market posted this information on its website for the specific purpose of furthering the common purpose and scheme of the enterprise to extort or defraud Pharmavite as described herein, and to wrongfully obtain gain and profit at the expense of Pharmavite by, among other things, extorting money through threats of an objectively baseless lawsuit and/or disadvantaging Pharmavite competitively and reputationally, to the benefit of those companies which participate or cooperate—willingly or unwillingly—in Defendants' scheme, and causing Pharmavite to sustain other losses and suffer other injuries, including but not limited to the cost of investigating and defending against Defendants' objectively baseless claims.

PHARMAVITE LLC'S FIRST AMENDED COMPLAINT

61.     Commencing on a date currently unknown to Pharmavite, but not earlier than January 1, 2018, Pure Market, acting in furtherance of Defendants' association-in-fact enterprise, posted on its website—to which CLP's website links—that the 250-count version of Pharmavite's Nature Made® Prenatal Multi was awarded a grade of C+. Pure Market posted this information on its website for the specific purpose of furthering the common purpose and scheme of the enterprise to extort or defraud Pharmavite as described herein, and to wrongfully obtain gain and profit at the expense of Pharmavite by, among other things, extorting money through threats of an objectively baseless lawsuit and/or disadvantaging Pharmavite competitively and reputationally, to the benefit of those companies which participate or cooperate—willingly or unwillingly—in Defendants' scheme, and causing Pharmavite to sustain other losses and suffer other injuries, including but not limited to the cost of investigating and defending against Defendants' objectively baseless claims.

62.     Commencing on a date currently unknown to Pharmavite, but not earlier than January 1, 2018, Pure Market, acting in furtherance of Defendants' association-in-fact enterprise, posted on its website—to which CLP's website links—a grade for the "purity" of both the 90-count and 250-count versions of the Nature Made® Prenatal Multi as "fair" (without explaining what that means). Pure Market posted this information on its website for the specific purpose of furthering the common purpose and scheme of the enterprise to extort or defraud Pharmavite as described herein, and to wrongfully obtain gain and profit at the expense of Pharmavite by, among other things, extorting money through threats of an objectively baseless lawsuit and/or disadvantaging Pharmavite competitively and reputationally, to the benefit of those companies which participate or cooperate—willingly or unwillingly—in Defendants' scheme, and causing Pharmavite to sustain other losses and suffer other injuries, including but not limited to the cost of investigating and defending against Defendants' objectively baseless claims.

PHARMAVITE LLC'S FIRST AMENDED COMPLAINT

63.     Commencing on a date currently unknown to Pharmavite, but not earlier than January 1, 2018, Pure Market, acting in furtherance of Defendants' association-in-fact enterprise, posted on its website—to which CLP's website links— a grade for the "heavy metals" in the 90-count version of Pharmavite's Nature Made® Prenatal Multi as "below average," and of the 250-count version as "fair" (again without explaining what either means). Pure Market posted this information on its website for the specific purpose of furthering the common purpose and scheme of the enterprise to extort or defraud Pharmavite as described herein, and to wrongfully obtain gain and profit at the expense of Pharmavite by, among other things, extorting money through threats of an objectively baseless lawsuit and/or disadvantaging Pharmavite competitively and reputationally, to the benefit of those companies which participate or cooperate— willingly or unwillingly—in Defendants' scheme, and causing Pharmavite to sustain other losses and suffer other injuries, including but not limited to the cost of investigating and defending against Defendants' objectively baseless claims.

64.     Commencing on a date currently unknown to Pharmavite, but not earlier than January 1, 2018, CLP, acting in furtherance of Defendants' association-in-fact enterprise, linked its website to Pure Market's website, which states that, based upon the "independent" testing of Ellipse Analytics, the 90-count version of Pharmavite's Nature Made® Prenatal Multi rates a grade of D+. This link and information were posted for the specific purpose of furthering the common purpose and scheme of the enterprise to extort or defraud Pharmavite as described herein, and to wrongfully obtain gain and profit at the expense of Pharmavite by, among other things, extorting money through threats of an objectively baseless lawsuit and/or disadvantaging Pharmavite competitively and reputationally, to the benefit of those companies which participate or cooperate—willingly or unwillingly—in Defendants' scheme, and causing Pharmavite to sustain other losses and suffer other injuries, including but not limited to the cost of investigating and defending against Defendants' objectively baseless claims.

65.     Commencing on a date currently unknown to Pharmavite, but not earlier than January 1, 2018, CLP, acting in furtherance of Defendants' association-in-fact enterprise, linked its website to Pure Market's website, which states that, based upon the "independent" testing of Ellipse Analytics, the 250-count version of Pharmavite's Nature Made® Prenatal Multi was awarded a grade of C+. Defendant CLP Market posted this information on its website for the specific purpose of furthering the common purpose and scheme of the enterprise to extort or defraud Pharmavite as described herein, and to wrongfully obtain gain and profit at the expense of Pharmavite by, among other things, extorting money through threats of an objectively baseless lawsuit and/or disadvantaging Pharmavite competitively and reputationally, to the benefit of those companies which participate or cooperate—willingly or unwillingly—in Defendants' scheme, and causing Pharmavite to sustain other losses and suffer other injuries, including but not limited to the cost of investigating and defending against Defendants' objectively baseless claims.

66.     Commencing on a date currently unknown to Pharmavite, but not earlier than January 1, 2018, CLP, acting in furtherance of Defendants' association-in-fact enterprise, linked its website to Pure Market's website, which states that, based upon the "independent" testing of Ellipse Analytics, both the 90-count and 250-count versions of the Nature Made® Prenatal Multi were awarded a "purity" grade of "fair" (without explaining what that means). This link and information were posted for the specific purpose of furthering the common purpose and scheme of the enterprise to extort or defraud Pharmavite as described herein, and to wrongfully obtain gain and profit at the expense of Pharmavite by, among other things, extorting money through threats of an objectively baseless lawsuit and/or disadvantaging Pharmavite competitively and reputationally, to the benefit of those companies which participate or cooperate—willingly or unwillingly—in Defendants' scheme, and causing Pharmavite to sustain other losses and suffer other injuries, including but not limited to the cost of investigating and defending against Defendants' objectively baseless claims.

67.    Commencing on a date currently unknown to Pharmavite, but not earlier than January 1, 2018, CLP, acting in furtherance of Defendants' association-in-fact enterprise, linked its website to Pure Market's website, which states that, based upon the "independent" testing of Ellipse Analytics, the 90-count version of Pharmavite's Nature Made® Prenatal Multi was awarded a "heavy metals" grade of "below average" and in the 250-count version of Pharmavite's Nature Made® Prenatal Multi was awarded a "heavy metal" grade of "fair" (again without explaining what either means). This link and information were posted for the specific purpose of furthering the common purpose and scheme of the enterprise to extort or defraud Pharmavite as described herein, and to wrongfully obtain gain and profit at the expense of Pharmavite by, among other things, extorting money through threats of an objectively baseless lawsuit and/or disadvantaging Pharmavite competitively and reputationally, to the benefit of those companies which participate or cooperate—willingly or unwillingly—in Defendants' scheme, and causing Pharmavite to sustain other losses and suffer other injuries, including but not limited to the cost of investigating and defending against Defendants' objectively baseless claims.

68.    The "grading" categories are depicted on Pure Market's website, to which CLP's website links, as lines of varying colors; on the 90-count version, the "heavy metals" category is red, while the overall "purity" is orange. The published "Grades" for Plaintiff's Nature Made® Prenatal Supplements are unsupported by CLP's and Pure Market's own published standards—their imprecision and opaqueness notwithstanding. Moreover, as set forth above, these "grades" are bogus, unwarranted, and in contravention of CLP's own Section VII's maximum tolerance limit requirements. In this manner, Defendants, acting in concert and through their Product Testing, Grading, and Sham Lawsuit Enterprise, are wrongfully disparaging Pharmavite and causing it reputational and monetary harm by, among other things, driving away or diverting customers who would otherwise purchase Pharmavite products, and driving or diverting those customers to sellers who compete with Pharmavite and who "sponsor"

Defendants, pay Defendants for "certifications" and "good" or "excellent" grades, or who otherwise participate with Defendants in the grading program, but whose products are not superior to Pharmavite's.

69.     Pharmavite is informed and believes that Defendant Hicks directed, was aware of, countenanced, ratified, and/or was recklessly indifferent to the acts of defendants Ellipse Analytics, Pure Market, and CLP as set forth above, and in so doing acted for the specific purpose of furthering the common purpose and scheme of the enterprise to defraud Pharmavite as described herein and to wrongfully obtain gain and profit at the expense of Pharmavite by, among other things, extorting money through threats of an objectively baseless lawsuit and/or disadvantaging Pharmavite competitively and reputationally, to the benefit of those companies which participate or cooperate—willingly or unwillingly—in Defendants' scheme, and causing Pharmavite to sustain other losses and suffer other injuries, including but not limited to the cost of investigating and defending against Defendants' objectively baseless claims.

70.     In addition, CLP's July 14, 2020 Demand Letter, sent by U.S. Mail, erroneously asserts that the Nature Made® Prenatal Supplements are adulterated with two heavy metals, lead and cadmium; are adulterated with pesticides; and are under-formulated with respect to folic acid. In fact, Nature Made® Prenatal Supplements are compliant with applicable governmental standards, including Proposition 65 and FDA standards, adhere to the USP, and are not adulterated with the heavy metals lead and cadmium; are not adulterated with pesticides; and are not under-formulated with respect to folic acid.

71.     The assertion set forth in the July 14, 2020 Demand Letter is premised, in part, on putative marketing claims that Pharmavite does not make regarding the products addressed in the letter, and on the putative conduct of a wholly-distinct dietary supplement company with which Pharmavite competes, but with which it does not have any other relationship. In the July 14, 2020 Demand Letter, CLP threatened to file (and has now filed) a sham lawsuit against Pharmavite in the Superior Court of the District

of Columbia if Pharmavite did not agree to pay to CLP the sum of $1.9 million and acquiesce to other demands premised on objectively baseless assertions about the Nature Made® Prenatal Supplements.

72.    In the July 14, 2020 Demand letter, immediately following the demand that Pharmavite pay $1.9 million to CLP and acquiesce to other demands, CLP "offered"—of course at a price—to help Pharmavite ease it way out of Defendant's scheme. CLP claimed:  "Given the "proprietary data" available to CLP . . . , CLP would be able to assist Nature's Bounty [*sic*] in ameliorating these concerns and would be happy to do so as a part of any settlement agreement. Note that actively engaging with a third-party non-profit to ameliorate these issues would reduce potential liability for Nature's Bounty [*sic*] in the future." Pharmavite is informed and believes and thereon alleges that CLP's "offer" was nothing more than an overt message that Pharmavite could "ameliorate" Defendants' wrongful and objectively baseless financial threats if it paid for use of Defendants' proprietary data and paid for CLP's phony certifications. In effect, CLP was offering to turn Pharmavite into a company that Defendants (through their phony certification scheme) would steer customers to rather than a company that Defendants would steer customers away from. CLP's "amelioration" offer, following immediately upon the heels of the $1.9 million demand, shows that Defendant's sham litigation "Legal Play" is inextricably linked to Defendants' overarching scheme of monetizing CLP's phony gradings and certifications.

73.    Pharmavite is informed and believes and thereon alleges that the "proprietary data" referenced by CLP in the July 14, 2020 Demand letter is data generated by, and under the control of, Defendants Ellipse Analytics and Hicks in furtherance of Defendants' enterprise and in support of their racketeering activities. Pharmavite is further informed and believes and thereon alleges that CLP's erroneous reference to Nature's Bounty in the July 14, 2020 Demand letter reflects that the letter was a "cut and paste" letter that was sent to many of Defendants' fraud and extortion targets, among which are Pharmavite and Pharmavite's competitor Nature's Bounty—

PHARMAVITE LLC'S FIRST AMENDED COMPLAINT

and the numerous similar lawsuits CLP has filed as part of Defendants' enterprise (to date there are at least fifteen), evidences Defendants' wide-ranging and continuing racketeering activities.

74.    CLP enclosed with its letter a draft complaint in which it falsely and baselessly alleged, among other things, that the Nature Made® Prenatal Supplements are adulterated under the District of Columbia Consumer Protection Procedures Act, D.C. Code Sections 28-3901 *et seq.* CLP threatened to file its complaint if Pharmavite did not agree to CLP's monetary and other extortionist demands. The entity on the letterhead and signature line ("Davitt Lalley Dey & McHale PC") and domain name ("DLDMLAW.com") on CLP's July 14, 2020 Demand Letter and enclosed draft complaint were the same as the entity on the signature block and email sent shortly thereafter, on August 28, 2020 by Defendant Hicks in a further threatening communication to Pharmavite (as discussed below), in which Defendant Hicks identified himself as "Chief Client Advocate" for CLP. Through his words, actions, and deeds, Defendant Hicks has all but given himself the appellation of "shot-caller" for Defendants' racketeering enterprise.

75.    On August 18, 2020, CLP sent by interstate wires a follow-up letter and email message to Pharmavite, again via its Michigan counsel, in furtherance of its sham litigation threat. Therein, CLP refused to provide testing information about the Nature Made® Prenatal Supplements requested by Pharmavite, and instead refocused on extorting money from Pharmavite to resolve the sham litigation, writing that if Pharmavite did not "resolve" the matter with CLP, CLP "will move forward with filing the complaint."

76.    On August 28, 2020, Defendant Hicks (CEO of Ellipse Analytics and Pure Market) emailed Pharmavite on behalf of CLP, identifying himself as CLP's "Chief Client Advocate" and referring to CLP as "our client." In his email, Hicks threatened to direct CLP to sue Pharmavite on claims that lack any objective basis or legal merit, writing that "[w]e are proceeding with filing a complaint against Pharmavite," and

threatening that "[i]f you lose, Pharmavite can expect to pay tens of millions if not more in damages." The entity on the letterhead and signature line ("Davitt Lalley Dey & McHale PC") and domain name ("DLDMLAW.com") on CLP's July 14, 2020 letter and draft complaint were same as the entity on the signature block and email of Defendant Hicks' August 28 email.

77.     Even if Defendants' test results were accurate (which is suspect in light of the fact that Ellipse Analytics' testing is neither "independent" nor peer reviewed, and Pharmavite is informed and believes, and thereon alleges, is lacking in nearly all measures of scientific validity), CLP's claims about lead in Pharmavite's Nature Made® Prenatal Supplements are false, and the grades published on Pure Market's website (as linked from CLP's website) for the Nature Made® Prenatal Supplements are unwarranted, objectively baseless, recklessly indifferent to the facts, and intentionally designed to wrongfully disparage Pharmavite and cause it monetary and reputational harm unless and until Pharmavite agrees to pay.

78.     The amount of lead that CLP claims was detected in Pharmavite's Nature Made® Prenatal Supplements is lower than Proposition 65's safe harbor allowance of 0.5 micrograms/day for lead. The amount of lead detected thus also is lower than CLP's own maximum tolerance limit requirements standards set forth in Section VII, which provide that the maximum allowance for lead is 0.5 micrograms/daily serving. The amount of lead detected also is lower than that of certain lots of Pharmavite's competitor SmartyPants' prenatal vitamins, which CLP gave its Purity Award, and which, commencing on a date currently unknown to Pharmavite, but not later than July 14, 2020, and continuing to this day, CLP and Pure Market published, and continues to publish, on their websites are the "best" prenatal vitamins.

79.     Similarly, the amount of cadmium that CLP (or Ellipse Analytics) allegedly detected in Pharmavite's Nature Made® Prenatal Supplements is lower than Proposition 65's safe harbor allowance of 4.1 micrograms/day for cadmium. It likewise is lower than the maximum allowance for cadmium under CLP's own standards as set

forth in Section VII. The amount of cadmium detected also is equal to or potentially lower than the amounts in certain lots of SmartyPants' vitamins, which CLP gave its Purity Award.

80.    Additionally, the amount of trace pesticides that CLP (or Ellipse Analytics) allegedly detected in Pharmavite's Nature Made® Prenatal Supplements is lower than any stated in the Code of Federal Regulations Tolerances and Exemptions for Pesticide Chemical Residues in Food. Accordingly, it also is lower than the maximum allowance for pesticides under CLP's Section VII maximum tolerance standards.

81.    Moreover, Pharmavite's Nature Made® Prenatal Supplements are formulated and rigorously tested to ensure that 100% or more of the label claim's folic acid is present in each product as of their respective expiration dates.

82.    Pharmavite is informed and believes and thereon alleges that Defendants knew these statements about lead and cadmium levels, pesticides, and folic acid in Pharmavite's Nature Made® Prenatal Supplements were false when they made them, and Defendants further knew or were recklessly indifferent to the fact that these statements were false or misleading, but these objectively baseless statements were nonetheless made, countenanced, ratified, or approved by Defendants and the Product Testing, Grading, and Sham Lawsuit Enterprise to wrongfully damage Pharmavite and benefit Defendants and the Product Testing, Grading, and Sham Lawsuit Enterprise.

83.    As the draft complaint that CLP sent to Pharmavite and the actual complaint filed thereafter reveal, the sham lawsuit is based on intentional or recklessly indifferent misrepresentations by Defendants regarding the contents of Pharmavite's Nature Made® Prenatal Supplements and objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits because it is based upon Defendants' testing methods (which includes the use of an affiliated laboratory), and in disregard for the fact that, as known to Defendants, Pharmavite's Nature Made® Prenatal Supplements met not only CLP's own stated guidelines, but also the applicable safety guidelines and regulations of the FDA, Proposition 65, and the USP. The sham

litigation, along with Defendants' misrepresentations regarding Pharmavite's Nature Made® Prenatal Supplements, were a direct and intentional attempt by Defendants and the Product Testing, Grading, and Sham Lawsuit Enterprise to wrongfully interfere with the business relationships of Pharmavite, a competitor of Defendants' paying customers, and to damage Pharmavite while wrongfully benefiting the Product Testing, Grading, and Sham Lawsuit Enterprise. CLP threatened to and did file the sham lawsuit without regard to the merits and for the unlawful purpose of fraudulently and wrongfully extracting and/or extorting money from Pharmavite to avoid the necessity of having to defend against Defendants' objectively baseless claims, or to otherwise wrongfully benefit the Product Testing, Grading, and Sham Lawsuit Enterprise at Pharmavite's expense and to its injury.

84. The Product Testing, Grading, and Sham Lawsuit Enterprise's scheme is reflective of, and is consistent with, Defendants' fraudulent business model. In essence, and per the model, Ellipse Analytics, under Defendant Hicks' control and with his approval, in furtherance of the common purpose of the enterprise, tests a target company's product for a number of parameters. In this case, the products are prenatal vitamins and the parameters tested are lead, cadmium, folic acid, and pesticides. In other cases, the Product Testing, Grading, and Sham Lawsuit Enterprise's targets include baby food, coffee, and pet food. Next, and again in furtherance of the common purpose of the enterprise as a whole, Ellipse Analytics, under Defendant Hicks' control and with his approval, works with Pure Market (also under Defendant Hicks' control and with his approval) and CLP to monetize Ellipse Analytics' test data. Defendants collectively monetize Ellipse Analytics' test data by "mining the data" for distinctions (with such distinctions being (a) insignificant with respect to governmental product safety or contaminant allowance standards, and (b) without reference to differences in product formulations (which formulation differences can, without exceeding applicable governmental standards, cause differences in analytical results for parameters of concern). Once these distinctions are identified, Defendants use the data in furtherance

PHARMAVITE LLC'S FIRST AMENDED COMPLAINT

of the fraudulent and extortionist scheme of the enterprise in two ways. First, Ellipse Analytics, under Defendant Hicks' control and with his approval, provides, "donates," or "licenses" the data to CLP and/or Pure Market. According to Ellipse Analytics, CLP's role in the enterprise is to "continue doing its thing of publicizing the data" and to try to sell phony purity certifications to the Defendants' fraud and extortion targets. Pure Market's role in the enterprise is, under Defendant Hicks' control and with his approval, to host and publish on an internet site the "bad" purity grades that Defendants concoct for their target products. Next, and if their fraud and extortion targets do not pay for the phony certifications, Defendants implement their "Legal Play." According to Ellipse Analytics, "where Certification is the carrot, the legal play is the stick." In short, where a target company, such as Pharmavite, refuses to pay for a fraudulent and extortionist shakedown, Defendants, through the enterprise and with CLP in the lead role, using Ellipse Analytics' loaned, "donated," or "licensed" data, sue or threaten to sue based on false, recklessly indifferent, objectively baseless, and fraudulent purity claims.

85.    Pharmavite is informed and believes and thereon alleges that the Product Testing, Grading, and Sham Lawsuit Enterprise's scheme and acts as set forth above are part of Defendants' regular way of doing business. As described in Ellipse Analytics' "Dashboard," one facet of Defendants' so-called "Legal Play" is that "More cases = More money." Pharmavite is further informed and believes and thereon alleges that the 15 or more lawsuits that CLP has filed are based in whole or in principal part on fraudulent and extortionist schemes and acts similar to those complained of herein.

86.    The Product Testing, Grading, and Sham Lawsuit Enterprise's scheme is not immunized by the First Amendment right to petition the government because the First Amendment protects only conduct that is "genuine," not conduct that is designed solely to extort businesses out of money, with no regard to the merits or outcome. Here, the allegations, threats, and demands set forth in the demand letters and the sham lawsuit were not genuine, but were objectively baseless and were brought and

undertaken with an unlawful motive. Further, upon information and belief, the Product Testing, Grading, and Sham Lawsuit Enterprise's fraudulent and extortionist schemes and conduct involve multiple sham lawsuits brought pursuant a policy of starting legal proceedings without regard to the merits and for an unlawful purpose.

87.    As set forth above, there are numerous indicators of the baselessness of the threats and allegations set forth in the demand letters and sham lawsuit. For example, Pharmavite is informed and believes, and thereon alleges, that Ellipse Analytics' testing of Pharmavite's Nature Made® Prenatal Supplements is not in fact appropriate or independent testing by a neutral third party laboratory; Defendants fraudulently and with reckless indifference characterized the test results and did not utilize sound scientific methodology to test Pharmavite's Nature Made® Prenatal Supplements; neither the testing nor the methodology were subjected to peer review; and the results of the testing were therefore inherently unreliable. In addition, as Defendants' own test results confirmed, and as Defendants have ignored, Pharmavite's Nature Made® Prenatal Supplements satisfied the safety standards of the FDA, USP, and Proposition 65, as well as CLP's own stated guidelines. In reckless disregard of these facts, CLP and Defendant Hicks threatened to sue and CLP has sued Pharmavite, falsely alleging, among other things, that Pharmavite's Nature Made® Prenatal Supplements are adulterated and contain levels of lead, cadmium, and pesticides in excess of competing products.

88.    As a proximate result of Defendants' actions, Pharmavite has suffered and will continue to suffer damages and loss in an amount to be determined at trial. By way of example and not by exclusion, Defendants' conduct, false representations, and sham lawsuit have proximately and directly caused Pharmavite lost sales, monetary costs and losses and attorneys' fees, as well as reputational harm, as described above. Defendants' actions have proximately caused and will continue to cause irreparable harm to Pharmavite for which there is no adequate remedy at law.

PHARMAVITE LLC'S FIRST AMENDED COMPLAINT

89.     As a result, Pharmavite is entitled to treble damages, attorneys' fees, and costs as set forth by law.

### SECOND CLAIM FOR RELIEF

(Violation of the Lanham Act, 15 U.S.C. § 1125(a))

90.     Pharmavite incorporates paragraphs 1 through 89 as though fully set forth herein.

91.     The Lanham Act is designed to protect companies such as Pharmavite against lost sales and injury to business reputation resulting from defendants' false or misleading advertising. The Lanham Act protects companies, such as Pharmavite, which are in "the zone of interest" of the false or misleading advertising.

92.     Pharmavite is within the "zone of interest" for purposes of bringing the Lanham Act claim against Defendants. Among other things, Defendants have unjustifiably tarnished Pharmavite's products and reputation, and are directly or indirectly benefiting themselves as well as Pharmavite's direct competitors with which Defendants have a relationship. Defendants tout the competitive advantage to those early adopters and others who pay Defendants to get certified (*i.e.*, the advantage over those who refuse to pay Defendants for certification).

93.     CLP states on its website that "Clean Label Project will work with you on the marketing of your award to both consumers and retailers." Pharmavite is informed and believes and thereupon alleges that Defendants, acting in concert and through the Product Testing, Grading, and Sham Lawsuit Enterprise, helped to promote and market the products of manufacturers, including Pharmavite's direct competitors, who, unlike Pharmavite, have paid for CLP Certifications and/or Purity Awards award based upon the results of the so-called "independent" testing (which testing is actually performed, at least in part, by Defendants' own, affiliated testing laboratory). As part of this promotion and marketing of its fee-paying customers, Defendants target, punish, and penalize those manufacturers, like Pharmavite, who do not agree to make payments to CLP. Pharmavite is further informed and believes, and thereupon alleges, that

Defendants knowingly, fraudulently, and with reckless indifference characterize their test results as "independent" in order to accomplish their goal of demonizing the competition of its favored clients, and thereby provide an unfair competitive advantage to these competitors. In this manner, Defendants, acting in concert and through the Product Testing, Grading, and Sham Lawsuit Enterprise, act on behalf of, or at least to the benefit of, Pharmavite's direct competitors by driving away or diverting customers who would otherwise purchase Pharmavite products, and driving or diverting those customers to sellers who compete with Pharmavite, and who "sponsor" Defendants, pay Defendants for "certifications" and "good" or "excellent" grades, or who otherwise participate with Defendants in the grading program, but whose products are not superior to Pharmavite's. As such, Defendants' conduct is competing with Pharmavite's business and sales, either directly or indirectly.

94.    As set forth above, Defendants' activities constitute false descriptions and representations concerning the nature, characteristics, and qualities of Pharmavite's goods (*i.e.*, Pharmavite's Nature Made® Prenatal Supplements) in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

95.    Defendants' false representations were made willfully and with intent to deceive the consuming public and to damage Pharmavite by driving away or diverting customers who would otherwise purchase Pharmavite products, and driving or diverting those customers to sellers who compete with Pharmavite, and who "sponsor" Defendants, pay Defendants for "certifications" and "good" or "excellent" grades, or who otherwise participate with Defendants in the grading program, but whose products are not superior to Pharmavite's.

96.    Defendants statements were literally false and misleading and deceived, or at least had the capacity to deceive, consumers.

97.    Defendants' false representations had and will have a material effect on the consumers' purchasing decision.

98.     Defendants' misrepresentations affect interstate commerce. Such misrepresentations appear on the Internet, and Pharmavite has suffered and will continue to suffer damages and loss throughout the United States.

99.     As a proximate result of Defendants' actions, Pharmavite has suffered and will continue to suffer damages and loss, including lost sales and other expenses, as described above, in an amount to be determined at trial. Defendants' conduct and false representations also have directly caused Pharmavite reputational harm. Defendants' actions have caused and will continue to cause irreparable harm to Pharmavite for which there is no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

(Violation of California's Unfair Competition Law,

Cal. Bus & Prof. Code §§17200 *et seq.*)

100.    Pharmavite incorporates paragraphs 1 through 99 as though fully set forth herein.

101.    California Business & Professions Code Section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business acts or practice." Defendants engaged in conduct that violated two of the statute's three prongs, for which Pharmavite has standing to assert claims.

102.    Defendants committed unlawful business acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.* by their violation of the following, as set forth in detail above:

a)  Civil RICO, 18 U.S.C. Section 1962;

b)  18 U.S.C. § 1341 (mail fraud);

c)  18 U.S.C. § 1343 (wire fraud);

d)  18 U.S.C. § 875 (extortion);

e)  18 U.S.C. § 1951 (extortion);

f)  California Penal Code § 523 (extortion); and

g)  Lanham Act (15 U.S.C. § 1125(a)).

103.    Defendants committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.* when, as set forth above, they made the false and misleading statements about "grades" assigned to, and related information about, Pharmavite's Nature Made® Prenatal Supplements, grading the Nature Made® Prenatal Supplements as inferior to those competing products despite the fact that Pharmavite's Nature Made® Prenatal Supplements are manufactured in compliance with all federal and state safety regulations, and in fact contain the same or fewer contaminants than other prenatal supplements, including SmartyPants prenatal supplements.

104.    Defendants committed further unfair business acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.,* when, as set forth above, they made extortionist threats against Pharmavite in the demand letters and by threatening Pharmavite with and filing sham litigation, *i.e.,* a lawsuit premised on objectively baseless claims.

105.    Defendants' unlawful and unfair business acts or practices occurred in the course of Defendants' business.

106.    As a direct and proximate result of Defendants' unlawful and unfair business practices, Pharmavite has suffered and will continue to suffer damages and loss, including lost sales and other expenses, as described above, in an amount to be determined at trial. Defendants' conduct and false representations also have directly caused Pharmavite reputational harm. Defendants' actions have caused and will continue to cause irreparable harm to Pharmavite for which there is no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF

(Declaratory Relief, 28 U.S.C. § 2201 *et seq.*)

107.    Pharmavite incorporates paragraphs 1 through 106 as though fully set forth herein.

108.    The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, *et seq.* prohibits the "introduction or delivery for introduction into interstate commerce

any food … that is adulterated." 21 U.S.C. § 331(a). The statute requires the FDA to enforce its provisions through injunctions, fines or imprisonment, or seizure of the adulterated food. 21 U.S.C. §§ 332–334. A private individual cannot bring an action to enforce the FDCA. 21 U.S.C. § 337(a). The FDCA exclusively governs the issues of whether a dietary supplement is "adulterated." *See* 21 U.S.C. § 342.

109.    A state law claim based on a false or misleading product labeling is preempted by the FDCA "if it seeks to impose labeling or other requirements that are not identical to the requirements imposed by [21 U.S.C.] § 343(q), § 343(r), and the implementing regulations for those provisions." *Gubala v. CVS Pharmacy, Inc.*, No. 14 C 9039, 2016 WL 1019794, at *4 (N.D. Ill. Mar. 15, 2016).

110.    "'Not identical to' … means that the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food, or concerning a food container, that: (i) Are not imposed by or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the act; or (ii) Differ from those specifically imposed by or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the act." 21 C.F.R. § 100.1(c)(4).

111.    Defendants have threatened to improperly file and have improperly filed sham state law claims against Pharmavite alleging, *inter alia*, that the Nature Made® Prenatal Supplements are "adulterated" despite the fact that they satisfy all of the applicable provisions under the FDCA and the implementing regulations, as well as the applicable Prop 65 standards, and Defendants' own standards.

112.    An actual, substantial, and continuing justiciable controversy exits between Defendants and Pharmavite with respect to which Pharmavite requires a declaration of its rights by this Court. At present, the controversy relates to the issue of whether the Nature Made® Prenatal Supplements are "adulterated" pursuant to the FDCA, and Defendants' right to threaten and/or maintain a lawsuit based upon a claim that the

Nature Made® Prenatal Supplements are "adulterated" in any manner that is inconsistent with the FDCA and the implementing regulations thereunder.

113.    To resolve the actual, substantial, and continuing justiciable controversy between Defendants and Pharmavite, Pharmavite seeks a judicial decision pursuant to 28 U.S.C. § 2201 *et seq*., declaring that:

    a.  the Nature Made® Prenatal Supplements are not adulterated under the FDCA; and

    b.  any state law claims by Defendants alleging that the Nature Made® Prenatal Supplements are "adulterated," and premised on such allegations, are preempted by the FDCA.

## PRAYER FOR RELIEF

WHEREFORE, Pharmavite prays for judgment and relief against Defendants, jointly and severally, as follows:

1.    For temporary, preliminary and permanent injunctive relief enjoining Defendants and their officers, agents, heirs, servants, employees, successors, and assigns, and those persons in active concert, participation or privity with them, or any of them:

    a.  From disparaging Pharmavite, its business, or its products in any manner, either in writing (including on the Internet), orally, or otherwise; and

    b.  From using any false description or false representation, and from making any false representations or from engaging in any act or acts which, either alone or in combination, constitute deceptive or unfair competition by Defendants with Pharmavite.

2.    That judgment be entered against Defendants for all damages sustained by Pharmavite on account of, *inter alia*, Defendants' violations of RICO, the Lanham Act, and the UCL, as well as treble damages as available under RICO.

3.    For declaratory judgment that:

1        a.  the Nature Made® Prenatal Supplements are not adulterated under the

2    FDCA; and

3        b.  any state law claims by Defendants alleging that the Nature Made®

4    Prenatal Supplements are "adulterated" and premised on such allegations, are

5    preempted by the FDCA.

6        4.     That Pharmavite be awarded costs, attorneys' fees, and pre-judgment and

7  post-judgment interest; and

8        5.     That Pharmavite be awarded other and further relief, both general and

9  special, at law and equity, as the Court may deem just and proper.

10
### JURY DEMAND

11        Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Pharmavite

12  hereby demands a jury of any and all issues so triable of right.

13

14  Dated:  October 14, 2020        TATRO TEKOSKY SADWICK LLP

15                           By:    /s/ *René P. Tatro*

16                             René P. Tatro, Esq.

17                             Attorneys for Plaintiff Pharmavite LLC

18

19

20

21

22

23

24

25

26

27

28

PHARMAVITE LLC'S FIRST AMENDED COMPLAINT

## CERTIFICATE OF SERVICE

I hereby certify that on this 14TH day of October, 2020, I electronically filed

**PHARMAVITE LLC'S FIRST AMENDED COMPLAINT FOR:**

**(1) CIVIL RICO, 18 U.S.C. SECTIONS 1962 & 1964;**

**(2) VIOLATION OF THE LANHAM ACT, 15 U.S.C.§ 1125(a);**

**(3) UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§17200 *et seq.*; and**

**(4) DECLARATORY RELIEF, 28 U.S.C. § 2201 *et seq.***

with the Clerk of the court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Andrew M. Purdy, Esq.
Herrera Purdy LLP
4590 MacArthur Blvd., Suite 500
Newport Beach, 92660
apurdy@herrerapurdy.com
Fax: 855-969-2050


/s/ *Karen L. Roberts*
Karen L. Roberts